```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                 │
│ DATE FILED: 9/23/2022                │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD KULICK,

                    Plaintiff,

        -against-

GAMMA REAL ESTATE LLC, GRE JV SLP
LLC, GAMMA FUNDING SPECIAL LIMITED
PARTNER LLC, JV MANAGEMENT LLC, N.
RICHARD KALIKOW, JONATHAN KALIKOW,
JOHN ILLUZZI, and VAN NGUYEN,

                    Defendants.

---

GAMMA REAL ESTATE LLC, GRE JV SLP
LLC, GAMMA FUNDING SPECIAL LIMITED
PARTNER LLC, JV MANAGEMENT LLC,

                    Counterclaim-
                    Plaintiffs/Third-Party
                    Plaintiffs,

        -against-

RICHARD KULICK,

                    Counterclaim-Defendant,

BEACON REAL ESTATE GROUP LLC and
CARLOS E. IMERY

                    Third-Party Defendants.

---

1:20-cv-03582-MKV

OPINION AND ORDER GRANTING
IN PART AND DENYING IN PART
CROSS-MOTIONS FOR SUMMARY
JUDGMENT

---

MARY KAY VYSKOCIL, United States District Judge:

        Plaintiff Richard Kulick brought this action for damages in relation to Defendants'

alleged scheme to freeze him out of a real estate investment business called GRE JV SLP LLC

("SLP") that they had jointly operated for several years.  Central to these claims, Kulick seeks to

recover fees he alleges Defendants wrongfully withheld or diverted from him following his not-

for-cause termination from the joint venture.  Specifically, Kulick claims that he retained an

economic interest in income earned by SLP, but that Defendants manufactured a reason to retroactively assign "cause" to his termination, in a brazen attempt to acquire his membership interests for a penny.  Kulick further claims that following his termination, Defendants wrongfully diverted to SLP payments due to him as a member of other investment vehicle LLCs.

Defendants counterclaimed seeking a declaratory judgment that they acted in accordance with the terms of the SLP operating agreement when they assigned "cause" to Kulick's termination and redeemed his membership interests.  In support, Defendants contend that Kulick spent his final month of employment—a grace period after being notified of his termination—advancing the interests of a new (and competing) company by misappropriating SLP's resources, soliciting its investors, and usurping its corporate opportunities.  Defendants further contend that Kulick's misconduct during this final month gives rise to claims for breach of fiduciary duty, breach of contract, and unfair competition.  Defendants also filed third-party claims against Kulick's new company and business partner.

Before the Court are the parties' cross-motions for summary judgment.[1]  [ECF Nos. 72, 77].  For the reasons that follow, the motion made by Kulick and the Third-Party Defendants is denied in its entirety.  The motion made by Defendants is granted in part and denied in part.

---

[1] In support of their Motion for Summary Judgment, Defendants filed a Memorandum of Law [ECF No. 74] ("Def. Br."), a Declaration of Darlene Fairman [ECF No. 73] ("Fairman Decl."), a Declaration of Jonathan Kalikow [ECF No. 75] ("Kalikow Decl."), and a Rule 56.1 Statement [ECF No. 76] ("Def. Facts").  In opposition, Plaintiffs filed a Memorandum of Law [ECF No. 89] ("Pl. Opp."), a Rule 56.1 Counterstatement [ECF No. 90] ("Pl. Counter"), and a Declaration of Richard Kulick [ECF No. 88] ("Kulick Decl. Opp.").  In reply, Defendants filed a Memorandum of Law [ECF No. 92] ("Def. Reply"), a Declaration of Darlene Fairman [ECF No. 93] ("Fairman Decl. Reply"), and a Declaration of Evan Gottlieb [ECF No. 94] ("Gottlieb Decl.").

In support his Motion for Summary Judgment, Kulick filed a Memorandum of Law [ECF No. 82] ("Pl. Br."), a Declaration of Richard Kulick [ECF. No. 79] ("Kulick Decl."), a Declaration of Aaron M. Zeisler [ECF. No. 78] ("Zeisler Decl."), and a Rule 56.1 Statement [ECF No. 81] ("Pl. Facts").  In opposition, Defendants filed a Memorandum of Law [ECF No. 86] ("Def. Opp."), a Rule 56.1 Counterstatement [ECF No. 87] ("Def. Counter"), and a Declaration of Darlene Fairman [ECF No. 85] ("Fairman Decl. Opp.").  Plaintiffs filed a Memorandum of Law in reply [ECF No. 95] ("Pl. Reply").

**BACKGROUND**

I.     **FACTS**[2]

     *A.     Formation of the Parties' Investment Vehicle – SLP*

     Richard Kalikow and Jonathan Kalikow own Defendant Gamma Real Estate LLC

("Gamma") and control Gamma's real estate development and financing businesses.  Def. Facts

¶ 1.  Kulick joined Gamma as "Chief Investment Officer, Multifamily" in 2015.  Pl. Facts ¶ 1;

Def. Facts ¶ 17.  Around that same time, Kulick and the Individual Defendants—Richard and

Jonathan Kalikow, John Illuzzi, and Van Nguyen—agreed to form a real estate investment

venture directed at multifamily properties in the Southeastern United States.  Def. Facts ¶ 16.

     As part of their joint venture, Kulick and the Individual Defendants formed Defendant

SLP and executed a Limited Liability Company Agreement.  Zeisler Decl., Ex. 15 ("SLP

Agreement").  As set forth in the SLP Agreement, the members of SLP were Kulick and

Defendants Gamma Funding Special Limited Partner LLC ("Gamma Funding") and JV

Management LLC ("JVM").  Pl. Facts ¶ 24.  Gamma Funding is controlled by the Kalikows

while JVM is controlled by Illuzzi and Nguyen.  Pl. Facts ¶ 24.

     The membership interests in SLP were divided into three classes: (i) Class A Members

have a Management Interest, or "right to participate in the management of the business and

affairs of the Company as a Member, expressed as a percentage"; (ii) Class B Members have a

Fee Income Economic Interest, or "right, expressed as a percentage, to share in the distributions

of Fee Income Available for Distribution"; and (iii) Class C Members have a Carried Interest

Income Economic Interest, or "the right, expressed as a percentage, to share in distributions of

---

[2] The following facts are taken from the parties' Local Civil Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motions, and the exhibits attached thereto.  Unless otherwise noted, where only one party's 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely disagrees with the inferences to be drawn from that fact.

Carried Interest Income Available for Distribution." SLP Agreement Art. II, § 6.1. SLP's Fee Income (with respect to Class B) is made up of proceeds from a one-time acquisition fee for each investment and an asset management fee. Def. Facts ¶ 40. The Carried Interest Income (with respect to Class C) comprises the profit share (or "promote fee") earned when an investment property is sold or substantially refinanced. Def. Facts ¶ 41-42.

Gamma Funding and JVM each held 43.75 percent of the Class A, B and C interests, and Kulick held the remaining 12.5 percent of each interest. Pl. Facts ¶¶ 26-27. Gamma Funding and JVM provided capital contributions (totaling $425,000) for their share. Def. Facts ¶ 31. Kulick contributed no capital, but earned his share through his role as SLP's "Administrative Member," tasked with day-to-day management of the company and with "implement[ing] the decisions of the Class A Members." SLP Agreement § 5.10(a); Def. Facts ¶ 31.

### B.     SLP's Role in the Multifamily Portfolio

The SLP Agreement provides that "the sole business of the Company shall be to receive certain fees and profits interests from Platform Investments and to pay certain expenses of the Company and the Members and their Affiliates in connection with such Platform Investments." SLP Agreement § 1.3. The term "Platform Investments" is defined as "multifamily real estate projects located in the Southeastern United State[s] and other secondary markets that the Company determines to directly or indirectly sponsor with the approval of a Supermajority in Interest." SLP Agreement Art. II.

During Kulick's tenure at Gamma and SLP, Defendants invested in eighteen multifamily properties: Elan, Parmer, Carrington, Windsor Falls, Highland Lake, Pavilion at Lake Eve, The Cove, The Clarion, Aventine, Springfield, Laurel View, Stone Ridge, Whitehall, Bartram Springs, Waverly Station, Pencil Factory, Park at Three Oaks and Trailside at Reedy Point. Pl.

Facts ¶ 4-5.  With each investment came the formation of a property specific general partner or managing limited liability company (the "Manager LLCs").  Pl. Facts ¶ 7.  Each of these entities had a membership consisting of a combination of Kulick and all or some of the Individual Defendants.  Pl. Facts ¶ 9.  The agreements covering the formation of these entities set forth how proceeds from the investments would flow to investors, members, and participants in the deal. Pl. Facts ¶ 22.

### C.    *The Withdrawal Provisions of the SLP Agreement*

The SLP Agreement provides for voluntary and involuntary withdrawal from SLP, with special rules applying to Kulick.  An involuntary withdrawal occurs for Kulick upon "his resignation as an employee of [Gamma] or its Affiliate or the termination by [Gamma] or its Affiliate of his employment for any reason or no reason."  SLP Agreement Art. II.  A voluntary termination for Kulick occurs, by contrast, only if he both resigns as an employee *and* "affirmatively voluntarily withdraws as a Member of the Company."  SLP Agreement Art. II. Upon a withdrawal from SLP, whether voluntary or involuntary, Class A and Class B interests held by Kulick automatically terminate.  SLP Agreement § 8.1(a)-(b).  Upon voluntary withdrawal, Kulick's Class C interests also terminate.  SLP Agreement § 8.1(c).

In the case of an Involuntary Withdrawal, however, Kulick's Class C interests "shall automatically be converted into an Economic Interest," defined as "the right, expressed as a percentage, to share in the allocation of one or more of the Company's allocable items . . . including Carried Interest Income Economic Interests."  SLP Agreement Article II, § 8.1(c).  In this event, the other Class A Members "shall have the right to cause the Company to purchase" Kulick's Class C interests "for the Fair Market Value of the Carried Interest Income Economic Interest."  SLP Agreement § 8.2.

But there is an important caveat: If Kulick's Involuntary Withdrawal arises from the termination of his employment "for Cause," then his "Class C Membership Interest shall be terminated and redeemed by the Company for the price of $0.01." SLP Agreement § 8.1(c). The SLP Agreement provides that "Cause" as it relates to Kulick's employment includes in pertinent part: (i) "[Kulick's] unethical conduct in the performance of his duties"; (ii) [Kulick's] breach of this Agreement or negligence in the performance of his duties . . . or if [Kulick] is determined to be in violation of [SLP's] or [Gamma's] employment or operations manuals"; and (iii) "breach of any of the provisions of Section 9.4 hereof." SLP Agreement Article II.

Pursuant to Section 9.4, "each Member agrees that he or she will not at any time, whether during his or her employment with the Company or thereafter, disclose to anyone (other than in furtherance of the business of the Company) any Confidential Information, or utilize such Confidential Information for his or her own benefit, or for the benefit of third parties." SLP Agreement § 9.4(a).

### D.   *Kulick's Termination*

Around the beginning of 2020, Defendants became frustrated with what they viewed as Kulick's "flawed and overly aggressive underwriting, inadequate collection, tracking and reporting of performance data and analytics, and poor quality of communications to investors." Def. Facts ¶ 277. Jonathan Kalikow expressed certain of these frustrations in an e-mail to Kulick sent on February 13, 2020, which concluded by stating: "I have no idea why we aren't selling [the properties] & doing so IMMEDIATELY." Zeisler Decl., Ex. 34. The day after receiving

6

that e-mail, Kulick asked the Individual Defendants to buy out his interests in SLP—a request that he repeated a few days later.  Def. Counter ¶ 82.  Defendants declined.  Pl. Facts ¶ 82.

On February 20, 2020, Kalikow sent an e-mail to Kulick which stated: "I was looking over the properties.  I see no defensible reason that we are not immediately selling the three pack [Elan, Parmer, and Carrington]."  Zeisler Decl. Ex. 33.  When Kulick responded that he had already taken steps to sell the properties through a recapitalization, Kalikow shot back: "I vote ABSOLUTELY NO to a recap of the three pack."  Zeisler Decl. Ex. 33.  When Nguyen was forwarded this exchange, he sent an e-mail to Kalikow and Illuzzi, which stated: "Unfortunately our agreement is pretty light, but I would image that insubordination or taking Major Decision without approval of the rest of partnership is a Cause event by most standards."  Zeisler Decl. Ex. 33.

On February 27, 2020, Defendants held a meeting in which they terminated Kulick, although they allowed him to remain employed until March 31, 2020.  Pl. Facts ¶ 83; Def. Facts 286.  Kulick was not told at that meeting, or at any point while he remained employed, that his termination was for "Cause."  Pl. Facts ¶¶ 92-93.  Roughly a month after the termination meeting, on March 20, 2020, Kalikow sent Kulick an e-mail explaining that his interests as a Class A Member and Class B Member would terminate once his employment with Gamma ends, but that he would retain his Class C Membership Interests and his membership rights in the Manager LLCs:

> As you know, on 3/31 your employment with [Gamma] will end. . . .
>
> You are currently a Class A Member, a Class B Member and a Class C Member of [SLP], as well as the current "Administrative Member."  Once your employment with [Gamma] ends, you will lose your Class A Membership rights (voting rights in [SLP]), your Class B Membership rights (rights to a percentage of fee income), and will no longer be the designated "Administrative Member."

> Nonetheless, as discussed, absent a termination "for cause", and unless the other members elect to buy out your Class C Membership Interests, you will retain your 12.5% Class C Membership Interests (rights to receive promote/carried interest income available for distribution).
>
> But as you know, [SLP] is the recipient of fee and promote income only – it does not directly control any deal. To the extent you are a member of the [general partnership] in the [multifamily] properties we currently still own, you will remain a member of that [general partnership], with the same voting rights that you have today. . . .

Zeisler Decl. Ex. 37. Thus, Kulick would continue to benefit from the sale of SLP's investment properties.

### E.      *Sale of Stone Ridge and Whitehall*

On March 13, 2020, midway through Kulick's final month of employment, Defendants closed on the sale of the Stone Ridge and Whitehall properties. Pl. Facts ¶ 97. These two properties are held in their entirety by AP-GRE Charlotte MF, LP ("Charlotte Holding I"), which received over $37 million from the two sales. Pl. Facts ¶¶ 12, 101-02. The Limited Partnership Agreement of Charlotte Holding I provides for the distribution of funds to the General Partner, defined as AP-GRE Charlotte MF GP, LLC ("Charlotte Holding II"). Zeisler Decl., Ex. 8 § 5.1. Pursuant to this agreement, the roughly $2.5 million in promote income from the sale of Stone Ridge and Whitehall was distributed to Charlotte Holding II. Pl. Facts ¶ 104. But that is not where the funds settled.

GRE Charlotte GP LLC ("Charlotte Holding III") held a 60 percent interest in Charlotte Holding II. Pl. Facts ¶ 105. A 60 percent allocation of the roughly $2.5 million in promote income would amount to approximately $1.5 million. Pl. Facts ¶ 105. But Charlotte Holding III—which was owned equally by Kulick, Illuzzi, and Nguyen—never received those proceeds. Pl. Facts ¶¶ 106-07. Instead, that full amount was distributed directly to SLP, despite the fact

that SLP (unlike Charlotte Holding III) appears nowhere on the organizational chart mapping out the entities involved in the Stone Ridge and Whitehall investments.  Pl. Facts ¶¶ 19, 107-08; Zeisler Decl., Ex. 7.

On March 17, 2020, the Chief Financial Officer for SLP and Gamma, Evan Gottlieb, informed Kulick via e-mail that his 12.5 percent allocation of the $1.5 million promote income (less a $300,000 reserve holdback) was about $150,000.  Def. Facts ¶¶ 111-12.  Kulick responded by asking if the distribution could be delayed so as to be made on April 15, 2020.[3] Def. Facts ¶ 122.  For reasons explained below, Kulick never received this distribution.

### F.    Defendants' Declaration of "Cause"

At some point in February 2020, Kulick informed Carlos Imery, a friend and Gamma investor, that he would be leaving Gamma.  Def. Counter ¶ 131.  Shortly thereafter, Kulick and Imery formed a company called Beacon Real Estate Group LLC ("Beacon").  Pl. Facts ¶ 132. Under the terms of the joint venture agreement, Beacon began operating on April 1, 2020.  Pl. Facts ¶ 133.  However, Beacon was "preparing to begin operations" by March 12, 2020, while Kulick was still employed by SLP and Gamma.  Pl. Facts ¶ 134.

These preparations included, most significantly, submitting a letter of intent to purchase properties known as Domain and Gateway ("D&G").  Pl. Facts ¶ 135.  Kulick had received notification of this "off-market" opportunity to acquire D&G through his Gamma e-mail account and, in pursuit of this opportunity, Kulick used certain models and investment presentations created by Gamma and SLP.  Def. Facts ¶¶ 355-76.  Beacon was awarded the D&G deal on March 20, 2020.  Def. Facts ¶ 393.  The deal closed on August 6, 2020.  Def. Facts ¶ 425.

---

[3] Kulick testified that he did so because he believed that the calculation of what he was owed from the promote was inaccurate.  Pl. Facts ¶ 120.  Defendants claim that Kulick requested as much because he believed that he would receive better tax treatment if his distribution was made after he moved to Florida.  Def. Facts ¶¶ 111-122.

Kulick never told Defendants during the final month of his employment about the D&G opportunity.  Def. Facts ¶ 436.  Rather, Defendants learned of the investment opportunity, and Kulick's involvement in it, when to ease the transition, Jonathan Kalikow began receiving Kulick's incoming e-mails on Kulick's final day of employment.  Def. Facts ¶ 455.  Specifically, around noon on Kulick's last day of employment, Kalikow received an e-mail addressed to "Richard [Kulick] / Beacon Team," which discussed recent updates in the pursuit of D&G.  Zeisler Decl., Ex. 76.  Kalikow immediately forwarded this e-mail to Nguyen and Illuzzi with the message: "For your reading enjoyment."  Zeisler Decl., Ex. 76.

On April 13, 2020, Defendants, through counsel, sent Kulick a letter (the "Termination Letter") explaining that they possessed "evidence that, during the term of [Kulick's] employment, [Kulick] engaged in conduct that constitutes 'Cause' as defined under the [SLP Agreement]."  Zeisler Decl., Ex. 78.  The Termination Letter specified that Kulick "wrongfully used, disclosed, and took the Companies' highly confidential, proprietary and/or trade secret information."  Zeisler Decl., Ex. 78.  The Termination Letter also purported to terminate and redeem Kulick's Class C Interests in SLP for $0.01, pursuant to the SLP Agreement.  Pl. Facts ¶ 160.  This letter marks the first time that "Cause" was assigned to Kulick's termination.  Zeisler Decl., Ex. 4 ¶ 73.

### G.  Gamma's Ongoing Sales of the Multifamily Portfolio Properties

After Kulick's departure on March 31, 2020, Gamma sold eight additional properties: Elan, Parmer, Carrington, Windsor, Aventine, Clarion, Pencil Factor and Highland.  Def. Counter ¶ 173.  The agreements governing the distribution of promote income from the sale of Elan, Parmer, and Carrington (collectively known as "Tech") provide for the payment of such income to GRE Tech Manager LLC, an entity in which Kulick has a 20 percent Economic

Interest.  Pl. Facts ¶¶ 175-183.  But instead of being paid to GRE Tech Manager LLC, all promote income from the Tech portfolio sale (roughly $3.5 million) was transferred to SLP in December 2020.  Pl. Facts ¶ 184.  JVM and Gamma Funding each received $800,000 as a distribution from these funds, while the remainder stayed in SLP's bank account through (at least) December 31, 2020.  Pl. Facts ¶¶ 186-87.

The agreements governing the distribution of promote proceeds from the sale of one of the properties, Windsor, similarly provide for the payment of promote income to GRE Windsor Manager LLC ("Windsor LLC"), an entity in which Kulick has a 20 percent Economic Interest. Pl. Facts ¶¶ 190-98.  Continuing the pattern, however, Defendants transferred the promote income received from the sale of Windsor (roughly $1 million) to SLP, rather than to the members of Windsor LLC.  Pl. Facts ¶ 199.

The sales of three additional properties, Aventine, Pencil Factory, and Highland, closed after the end of discovery in this action.  Pl. Facts ¶ 241.  Kulick owns 20 percent of the managing companies for Aventine and Highland, and 12.5 percent of the managing company for Pencil Factory.  Pl. Facts ¶ 242; Zeisler Decl., Exs. 100-03, 105-07.  No promote income was earned from the sale of Aventine.  Def. Facts ¶ 244.  The promote income (if any) from the sales of Highland and Pencil Factor have not yet been determined.  Pl. Facts ¶¶ 244-45.

## II.    PROCEDURAL HISTORY

Kulick initiated this action by filing a complaint in May 2020.  [ECF No. 1].  After Defendants moved to dismiss the original complaint [ECF No. 16], Kulick filed an Amended Complaint ("AC") asserting eight causes of action [ECF No. 20].  Specifically, Kulick alleged that:

1.  *SLP, Gamma Funding, and JVM breached the SLP Agreement by purporting to retroactively assign "Cause" to his termination and thereby purporting to redeem his Class C Membership Interests for a penny.  AC ¶¶ 99-107.[4]

2.  *Gamma Funding and JVM breached their fiduciary duty to him by scheming to force Kulick out of SLP, hindering Kulick's ability to manage the multifamily portfolio, and sabotaging Kulick's relationships with property managers and investors.  AC ¶¶ 108-16.

3.  Gamma Funding was unjustly enriched by funds from the Partnership Properties that rightly belonged to Kulick.  AC ¶¶ 117-25.

4.  Kulick was entitled to an equitable accounting of the records for Gamma Funding and SLP because the companies co-mingled funds to conceal funds owed to him.  AC ¶¶ 126-32.

5.  *Illuzzi and Nguyen breached the GRE Charlotte GP LLC Agreement by failing to pay Kulick the funds he was owed from the sale of the Stone Ridge and Whitehall properties.  AC ¶¶ 133-40.

6.  *Individual Defendants breached their fiduciary duty by: (1) funneling funds to SLP for the purposes of self-dealing, rather than to the Manager LLCs in which Kulick holds an interest; and (2) intentionally withholding from Kulick information about the financial status of the Manager LLCs.  AC ¶¶ 141-50.

7.  *Defendants each aided and abetted the breaches of fiduciary duty outlined in the other causes of action.  AC ¶¶ 151-55.

8.  Kulick is entitled to a declaratory judgment setting forth his right to payments from the Partnership Properties and confirming that he remains a member with management authority over the Manager LLCs for the Partnership Properties.  AC ¶¶ 156-65.

Defendants filed a Motion to Dismiss the second, third, fourth, sixth, seventh, and eighth causes of action.  [ECF No. 21].  On March 10, 2021, this Court issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss.  [ECF No. 52] ("March 10 Opinion").  Specifically, this Court dismissed Cause of Action Six (to the extent that the claim related to the withholding of financial information) and Cause of Action Eight (in its entirety).

---

[4] An asterisk is placed before each Cause of Action which remains in this case in full or in part.

March 10 Opinion at 20, 25-26.  Defendants' motion was denied in all other respects.  *Id.*
Defendants thereafter filed an Answer to the Amended Complaint.  [ECF No. 53].

While their Motion to Dismiss was pending, Defendants filed a Third-Party Complaint
against Beacon and its Managing Partner, Carlos Imery, as well as several counterclaims against
Kulick.  [ECF No. 40, 42].  The counterclaims filed against Kulick included: (i) a claim for
declaratory judgment that the redemption of Kulick's Class C Membership Interests in SLP was
valid and enforceable; (ii) a claim that Kulick breached his fiduciary duties and duties of loyalty
to Gamma, SLP, and SLP's Members by, among other things, misappropriating their resources,
usurping their corporate opportunities, and soliciting their investors; (iii) a claim that Kulick
breached the SLP Agreement by distributing the company's confidential information; and (iv) a
claim that Kulick engaged in unfair competition by misappropriating SLP's resources.  [ECF No.
42].  The Third-Party Complaint contained claims for: (i) aiding and abetting Kulick's breach of
fiduciary duty; (ii) tortious interference with the SLP Agreement; (iii) unfair competition; (iv)
unjust enrichment; and (v) a permanent injunction.  [ECF No. 42].  Both the Third-Party
Defendants and Kulick answered the claims against them.  [ECF Nos. 49-50].

After the close of discovery, the parties voluntarily dismissed with prejudice Counts 3
and 4 of the Amended Complaint.  [ECF No. 71].  Shortly after doing so, the parties filed cross
motions for summary judgment.  Defendants sought an order dismissing each of the remaining
claims asserted in the Amended complaint and granting summary judgment on each of their
counterclaims and third-party claims, seeking damages of over $4 million.  [ECF No. 72].
Kulick and the Third-Party Defendants, for their part, sought an order dismissing each of the
counterclaims and third-party claims, and granting summary judgment on each remaining claim
in the Amended Complaint, seeking damages of over $10 million.  [ECF No. 77].

## LEGAL STANDARD

### I.   SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The court "may not make credibility determinations or weigh the evidence."  *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).  The court "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."  *Id.*  If there is evidence in the record that supports a reasonable inference in favor of the opposing party, summary judgment is improper.  *See Brooklyn Ctr. For Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021).  In a contract dispute, summary judgment is generally inappropriate unless the contract is "wholly unambiguous."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

### II.   GOVERNING LAW

The SLP Agreement provides that "[t]his Agreement, the application or interpretation hereof, and any disputes arising hereunder or in connection herewith, shall be governed by and in accordance with the laws of the State of Delaware applicable to agreements made and fully to be performed therein, and specifically the [Delaware Limited Liability Company Act]."  SLP Agreement § 12.3.  Each of the Manager LLC Agreements have similar Delaware choice-of-law provisions.[5]  Since each claim brought by Kulick arises from or in connection with the SLP Agreement or the Manager LLC Agreements, those claims are all governed by Delaware law.

---

[5] *See* Fairman Decl. Exs. 43 § 12.3, 69 § 12.3, 78 § 12.3, 83 § 12.3, 87 § 1.04, 92 § 12.3, 96 § 12.3, 100 § 12.3, 106 § 12.3.

Neither party disputes this point, though both parties support their arguments with respect to these claims with citations to both Delaware and New York law.

As for the counterclaims, Defendants' claims for a declaratory judgment and breach of contract are governed by Delaware law because those claims both arise from a dispute in connection with the SLP Agreement.  Defendants contend that their unfair competition claim also arises from the SLP Agreement and, as a result, is governed by Delaware law.  As for their breach of fiduciary duty claim, Defendants contend that both Delaware and New York law apply, since Kulick's duties as an Administrative Member of SLP are governed by the law of Delaware, where SLP is incorporated, and his duties owed to and employment relationship with Gamma are governed by the law of New York, where Gamma is headquartered and Kulick was employed. *See Ebusinessware, Inc. v. Tech. Servs. Grp. Wealth Mgmt. Sols., LLC*, No. 08-cv-9101, 2009 WL 5179535, at *7 (S.D.N.Y. Dec. 29, 2009) ("Under New York law, the law of a company's state of incorporation governs a claim for breach of fiduciary duties by a corporate officer. . . . As opposed to the corporate officer duty arising under Delaware law, New York law governs in the employer-employee context.").  As for their third-party claims, Defendants rely on New York law, although they do so without explanation or analysis.

Kulick and the Third-Party Defendants, for their part, cite to both New York and Delaware law on all claims, although they never engage in a choice-of-law analysis or actively dispute any choice-of-law contentions made by Defendants.  Normally, where there is a question regarding choice of law, the Court is obligated to conduct its own choice of law analysis regardless of the Parties agreement on the issue. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  Because the Court has jurisdiction over this case by reason of the Parties' diversity, the Court applies New York's choice-of-law rules. *See Fieger v. Pitney Bowes Credit*

*Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). However, "[u]nder New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011). "If not, no choice of law analysis is necessary." *Id.*

After reviewing the relevant case law, the Court is not aware of, and the parties have not identified, any conflict between Delaware and New York law as it relates to claims for unfair competition, aiding and abetting, tortious interference, or unjust enrichment. The Court will thus apply New York law to each of these claims. *See Am. Lecithin Co. v. Rebmann*, No. 12-cv-929, 2020 WL 4260989, at *15 n.28 (S.D.N.Y. July 24, 2020) ("'As the parties have not alerted me to an actual conflict' and cite principally to cases applying New York law, and as I have not independently identified such a conflict, I apply New York law to this claim." (alterations adopted) (quoting *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 220 (S.D.N.Y. 2015)); *see also Interestate Foods, Inc. v. Lehmann*, No. 06-cv-13469, 2008 WL 4443850, at *3 (S.D.N.Y. Sept. 30, 2008) (applying New York law to breach of fiduciary duty claim because "parties [had] not submitted any evidence that there [was] actually a conflict of law").

As for breach of fiduciary duty, the only conflict identified between New York and Delaware law pertains to the corporate opportunity doctrine. A corporate officer may not take a business opportunity for his own under Delaware law if, among other things, "the corporation has an interest or expectancy in the opportunity." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). Under New York law, by contrast, a claim for diversion or usurpation of a

corporate opportunity cannot prevail unless the corporation had a "'*tangible* expectancy' in the opportunity, which is something 'more certain than a "desire" or a "hope."'" *Altman Stage Lighting, Inc. v. Smith*, No. 20-cv-2575, 2022 WL 374590, at *8 (S.D.N.Y. Feb. 8, 2022) (emphasis added) (quoting *Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d 241, 246, 542 N.Y.S.2d 530 (1st Dep't 1999)).

The Court finds that Delaware law applies to this claim.  While Defendants alleged that Kulick breached his fiduciary duty to SLP and Gamma by "failing to disclose and instead usurping corporate opportunities that belonged to SLP and/or [Gamma]," they have revised that claim at the summary judgment stage to claim that the corporate opportunity was taken only from SLP—a seeming attempt to sidestep New York's more stringent standard.  Def. Opp. at 24-25 ("Delaware law applies because D&G was usurped from SLP and its members" and "[t]he SLP Agreement's choice of law provision applies to tort claims").

## **DISCUSSION**

The pending cross-motions for summary judgment concern a series of claims, counterclaims, and third-party claims, which all involve overlapping issues of fact and of law.  The Court will begin by addressing Defendants' counterclaims, will proceed next to their third-party claims, and last will turn to the claims brought by Kulick.  The discussion for each claim proceeds in the order of the relevant causes of action.

## I.   COUNTERCLAIMS AGAINST KULICK

### A.   *Cause of Action One – Declaratory Judgment that Defendants are not in Breach of Contract for Retroactively Assigning "Cause"*

Defendants claim that they are entitled to a declaratory judgment that they acted in accordance with the terms of the SLP Agreement when they retroactively assigned "Cause" to Kulick's termination and redeemed his Class C Membership Interests in SLP for a penny.[6]

The starting point for this claim is not whether "Cause" could be assigned retroactively, but whether it could be assigned at all.  Clearly it could have.  The SLP Agreement defines "Cause" to include termination that resulted from "unethical conduct in the performance of [Kulick's] duties," breaches of the confidentiality covenant in Section 9.4 of the SLP Agreement, and violations of employment manuals or conduct that is not in the best interest of SLP or Gamma.  SLP Agreement Article II.  Kulick is guilty of all these offenses.  He spent his final month of employment misusing the resources of Gamma and SLP, soliciting Gamma and SLP investors, and potentially usurping corporate opportunities, all for the benefit of his new company.  *See infra* Sections I.B.  Such conduct, by definition, constitutes Cause.

The more difficult question concerns retroactivity.  Defendants did not assign cause to Kulick's termination until nearly two weeks after his final date of employment—and nearly two months after he was first informed of the termination.  Defendants justify this delay by noting that they had no reason to suspect Kulick of misconduct until the final day of his employment, when they happened to stumble upon an e-mail that detailed Kulick's covert pursuit of D&G.  According to Defendants, that discovery did not lead to an on-the-spot assignment of Cause because there was an effort "to understand the problem, to gather data, and to try to make a

---

[6] This claim is governed by Delaware law because it arises out of or in connection with the SLP Agreement.

thorough investigation of what was happening."  Fairman Decl., Ex. 8 (Nguyen Dep. Tr.) at 184:17-185:8.

Kulick claims that this delay cost Defendants the opportunity to redeem his Class C Membership Interests for a mere penny.  In so doing, Kulick notes that the SLP Agreement provides that "[f]rom and after the date of any Involuntary Withdrawal, [Kulick's] Class C Membership Interest . . . shall *automatically be converted* into an Economic Interest."  Section 9.1(c) (emphasis added).  Kulick recognizes that this conversion to an Economic Interest would not occur if his Involuntary Withdrawal arose from a for-Cause termination.  But he claims that if cause for termination is not assigned before his final day of employment, then the conversion to an Economic Interest occurs automatically, immediately and irrevocably.  After all, Kulick contends, there would be no Class C Membership Interest for the company to redeem once the conversion takes place.

Defendants rebut this argument by invoking the "after-acquired evidence" doctrine, "which federal courts have applied in the employment discrimination setting" to "allow[] an employer to introduce evidence the employer collected after the discharged employee brings suit for wrongful discharge."  *Davenport Grp. MG, L.P. v. Strategic Inv. Partners, Inc.*, 685 A.2d 715, 723 (Del. Ch. 1996).  Defendants note that courts have applied the doctrine in contract disputes and argue that, as a result, it should be applied to allow retroactive assignment of Cause in this case.  At the time that summary judgment was briefed, however, the Delaware case law on this doctrine was thin and largely distinguishable.  *See, e.g.*, *Schiavello v. Delmarva Sys. Corp.*, 61 F. Supp. 2d 110, 114 (D. Del. 1999) (holding "that after-acquired evidence of resume fraud is a complete defense to a claim of breach of contract"); *Davenport*, 685 A.2d at 723 (holding that

post-termination evidence of cause for removal is not *per se* irrelevant in an action challenging the removal of a general partner).

But Defendants received a post-briefing boon when the Delaware Court of Chancery decided *Metro Storage International LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022), with facts strikingly similar to the present case.  That case involved an executive who had resigned from his company to take advantage of an opportunity that he had learned about when he was improperly providing outside consulting services during his employment.  *Metro Storage*, 275 A.3d at 835. The company discovered the misconduct only because of its policy that after an employee leaves, the employee's supervisor receives copies of e-mails addressed to that employee's company e-mail address.  *Id.* at 836.  The company filed suit alleging, among other things, that the executive breached the company's operating agreement by sharing confidential information for a purpose inconsistent with the company's benefit, and sought a declaratory judgment that it could repurchase the executive's units in the company at no cost.  *Id.* at 838.

The company's claim for a declaratory judgment hinged on a provision in its operating agreement which provided that "[t]he executive shall not be eligible to receive any value for his Units [in the company] . . . if termination is a Cause Termination."  *Id.* at 874.  The issue was whether the company could exercise that option even though the executive had voluntarily resigned, and his misconduct was not discovered until his term of employment had concluded. *Id.* at 879.  The court held that the option could be exercised because of the after-acquired evidence doctrine.  In so doing, the court noted that the doctrine had typically been limited to claims of wrongful termination; but it explained that the doctrine "applies all the more persuasively in this setting, where a faithless fiduciary like [the defendant] concealed the wrongdoing that could have supported a for-cause termination."  *Id.*  The court reasoned that

20

"[i]f the after-acquired evidence doctrine did not apply, then the faithless fiduciary would benefit from his wrongful acts.  He would be better off for having breached his duty of loyalty by concealing his misconduct than he would have been if he had been honest and forthright." *Id.*

The facts from *Metro Storage* are closely analogous to those present in this action.  Each case concerns concealed misconduct (including the misuse of confidential information), which was discovered by chance through e-mail policies intended to ease the transition of departing employees.  In both cases, the company that belatedly discovered the misconduct tried to use it to retroactively assign cause to the wrongdoer's termination, so as to trigger a repurchase provision. The cases have but one notable difference: the company in *Metro Storage* did not come across the incriminating e-mail until *after* the executive's employment had ended, while Kalikow discovered the D&G e-mail on the final day of Kulick's employment, a few hours before he left, and waited over a week to invoke cause.

But the distinction is immaterial.  The e-mail thread that Kalikow discovered discusses D&G, and Kulick's pursuit of the opportunity, but it does not reveal how Kulick first learned of the opportunity, or that he pursued the opportunity, at least in part, by misusing resources that belonged to Gamma and SLP.  That is not to suggest that Kalikow had no reason to suspect that the discovery could give rise to a for-cause termination.  When he forwarded the incriminating e-mail chain to Nguyen and Illuzzi on the day of its discovery, he could hardly hide his excitement at the prospect of receiving a windfall.  But Defendants assert that further investigation was needed before action was taken, and it is undisputed that any investigation could not be conducted thoroughly in the few final hours of Kulick's employment.

This Court finds that the reasoning from *Metro Storage* applies to this case with full force.  There can be no doubt that Defendants would have terminated Kulick for cause had his

misconduct been known from the time it began.  Kulick cannot not now reap the gains of his concealment.  The Court accordingly grants Defendants' motion for summary judgment on this claim and denies Kulick's cross-motion for summary judgment dismissing this claim.

### B.  Cause of Action Two – Breach of Fiduciary Duty

To establish breach of fiduciary duty, one must establish "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach."  *Zurich Am. Life Ins. Co. v. Nagel*, No. 20-cv-11091, 2022 WL 759375, at *12 (S.D.N.Y. Mar. 14, 2022).[7]

#### 1)  The Duty

Kulick owed a fiduciary duty to SLP as its Administrative Member.  *See Beard Rsch. Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) ("[T]he evidence shows that [the defendant] managed the [company]; thus, he owed fiduciary duties to [the company] as an officer . . . .").  Kulick also owed Gamma a fiduciary duty in his role as Chief Investment Officer, Multifamily, even as an at-will employee.  *See Nielson Co. (US), LLC v. Success Sys., Inc.,* No. 11-cv-2939, 2013 WL 1197857, at *9 (S.D.N.Y. Mar. 9, 2013) ("As a matter of law, an employee owes a fiduciary duty to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost faith and loyalty in the performance of his duties." (internal quotation marks omitted)).  Defendants claim that Kulick breached his fiduciary duties to both entities.

---

[7] For the reasons discussed above, these claims are governed by New York law insofar as they concern Kulick's relationship with Gamma, and they are governed by Delaware insofar as they concern Kulick's relationship with SLP.  Since the breach of fiduciary duty claim premised on the corporate opportunity doctrine concerns only SLP, that claim is governed only by Delaware law.

### 2) *The Breach*

Defendants allege that Kulick breached his fiduciary duties to SLP and Gamma by (1) misappropriating their resources; (2) soliciting their investors; and (3) failing to disclose, diverting, and usurping their corporate opportunities.  These theories will be addressed in turn.

### i.   *Misappropriating Resources*

Defendants claim that Kulick breached his fiduciary duties to SLP and Gamma by misusing their resources for personal gain.  The alleged misuse was perhaps most persistent and most offensive as it related to Gamma's research and work product, such as models and investing presentations, most of which was confidential.  The precise nature of this misuse is catalogued in the discussion of Defendants' breach of contract claim.  *See infra* Section I.C.  But suffice it to say that the misconduct on this score was serious, and clearly constitutes a breach of fiduciary duty.  *See Metro Storage*, 275 A.3d at 858 ("The misuse of confidential information is inherently a breach of fiduciary duty" (internal quotation marks omitted)); *McKinnon Doxsee Agency, Inc. v. Gallina*, 187 A.D.3d 733, 736-37 (2d Dep't 2020) (granting judgment for breach of fiduciary duty where defendant copied and provided customer and policy information to his new employer prior to his departure).

Kulick also misused the human resources of Gamma when, in February 2020, Kulick directed a Gamma analyst, Mack Levine, to prepare a draft letter of intent, respond to a buyer's questionnaire, update an underwriting model, and obtain insurance and financial information from third parties for a possible investment in an apartment community known as Abbington Place.  Def. Facts ¶¶ 310, 323-46.  Kulick forwarded these materials to Imery, and together they scrubbed references to Gamma from the documents before they submitted them from Beacon.  Def. Facts ¶¶ 323-46.  Similarly, in March 2020, Kulick directed Levine to update an

underwriting model for the prospective acquisition of a different apartment community, known as Magnolia Terrace.  Def. Facts ¶¶ 13, 460-70.  Kulick then forwarded the model and due diligence to Imery and Emmely Morales, who became Beacon's Investor Relations Analyst. Def. Facts ¶¶ 13, 460-70.

Finally, Kulick misused the Gamma facilities by conducting business for Beacon through his Gamma e-mail, thereby misrepresenting Gamma's involvement in prospective deals (which he was not pursuing for Gamma), to lenders, brokers, bankers, and others.  Def. Facts ¶¶ 347, 382, 393, 396, 405-09, 453.  This misuse of resources constitutes a breach of his fiduciary duty. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011) ("Although an employee may, of course, make preparation to compete with his employer, he or she may not do so at the employer's expense, and may not use the employer's resources, time, facilities, or confidential information . . . .")

## ii.   *Soliciting Investors*

Kulick solicited Gamma investors during his final month of employment as he attempted to round up capital for the D&G deal.  On March 27, 2020, for instance, Kulick, using his Gamma e-mail account, solicited principals of Brightstone Capital (which had invested in Springfield with Gamma) to invest in D&G with Beacon.  Def. Facts 416-17.  Kulick disputes that he was soliciting investments from Brightstone (Pl. Counter ¶ 416), but the e-mails could not be clearer.  Def. Ex. 138 ("I am sending you both a new acquisition opportunity in Atlanta, off-market, discounted pricing. It will be from Beacon Real Estate Group . . . ."); Def. Ex. 324 ("Please see the attached for an overview of Beacon, as well as a new off-market multifamily investment opportunity.").  This was a sales pitch, pure and simple.  But it was for the benefit of his future company, rather than his current employer.  That is a textbook breach of fiduciary

duty.  *See Beard*, 8 A.3d at 602 ("A breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including . . . solicitation of employer's customers before cessation of employment."); *Pure Power*, 813 F. Supp. at 521-22 (noting that an "employee, while still employed by the employer, may not solicit clients of his employer").

### iii.    *Usurping Corporate Opportunities*

Defendants claim that Kulick breached his fiduciary duty by failing to disclose, diverting, and usurping corporate opportunities.  Pursuant to Delaware's corporate opportunity doctrine, a fiduciary cannot take an opportunity that belongs to the corporation he serves.  "To prove misappropriation of a corporate opportunity, a plaintiff must show: (1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary is placed in a position inimical to his duties to the corporation."  *Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, C.A. No. 3290-VCP, 2009 WL 1387115, at *13 (Del. Ch. May 18, 2009).

The seminal Delaware case on the corporate opportunity doctrine is *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148 (Del. 1996).  The defendant in that case was a director of a company called Cellular Information Systems ("CIS"), and he was also the President and sole stockholder of a company called RFB Cellular, Inc. ("RFBC").  *Broz*, 673 A.2d at 150.  The conduct before the court involved the director's purchase of a cellular telephone service license for the benefit of RFBC.  *Id.*  At the time, the director did not consider CIS to be a viable purchaser for the license because of its recent financial difficulties.  *Id.* at 151.  The Delaware Supreme Court reviewed the director's conduct by analyzing the four factors outlined above,

explaining that "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.* at 155.

The court explained that "while it may be said with some certainty that the [relevant license] was within CIS's line of business, it is not equally clear that CIS had a cognizable interest or expectancy in the license." *Id.* at 156. Specifically, the court noted that while "the nature of the [license] opportunity was historically close to the core operations of CIS, changes were in process. . . . CIS was actively engaged in the process of divesting its cellular license holdings," and its "business plan did not involve any new acquisitions." *Id.* As a result, the court found that "CIS had no interest or expectancy in the . . . opportunity." *Id.* at 156-57. Viewing that factor in light of the totality of the circumstances, including CIS's financial distress, the court held that the director "did not usurp an opportunity that properly belong to CIS." *Id.* at 157.

Against the *Broz* framework, this Court now turns to the claim that, during his term as SLP's Administrative Member, Kulick usurped SLP's business opportunity by failing to disclose the D&G opportunity to Defendants.[8] Since the parties do not dispute that Defendants were financially able to exploit D&G, the relevant analysis hinges on the line of business and expectation factors. Kalikow Decl. ¶ 33. The line of business factor might appear straight forward: D&G are multifamily properties located in Decatur, Georgia, and therefore squarely fall within the definition of a Platform Investment under the SLP Agreement. Def. Facts ¶ 34. It is not entirely clear, however, that buying D&G fell within SLP's line of business *at the time* that Kulick took the opportunity for himself. Indeed, *Broz* suggested that this factor could turn on the

---

[8] Defendants contend that Kulick failed to disclose at least nine business opportunities, in addition to D&G, that were directed to him at his Gamma e-mail from brokers and other third parties, and instead sent those opportunities to Imery and Beacon to investigate. Def. Facts ¶¶ 437-59, 471-83, 486-95. However, Defendants only claim to have been damaged by the failure to disclose, diversion, and usurpation of D&G.

company's "business strategy," *Broz*, 673 A.2d at 156 n.7, which may coalesce with a company's interests and expectations.

The interests and expectations that SLP had in acquiring new properties around the time of Kulick's departure is hotly disputed. Kulick claims that Defendants had no interest in buying at that time, only in selling. This interest in divesting, rather than investing, is evidenced, in part, by a December 2019 e-mail exchange between Kulick and the Individual Defendants. Specifically, Kulick e-mailed Nguyen, Illuzzi and Jonathan Kalikow with a subject "2020" to suggest that the company should "sell into this market." Zeisler Decl., Ex. 29. Kalikow responded: "THAT'S WHAT I HAVE BEEN SAYING WE BETTER BE SELLING." Zeisler Decl., Ex. 29. According to Kulick, this attitude translated into concrete business strategy. Gamma sold Stone Ridge and Whitehall in March 2020. And since Kulick's departure, eight additional properties have been sold, while *no* new multifamily properties have been purchased. Pl. Facts ¶ 162.

While Defendants do not dispute this fact, they do dispute Kulick's characterization of their plans. They claim that they would have pursued the D&G opportunity had it been presented to them before it was awarded to Beacon, but they only learned about it on the eve of Kulick's departure, when it was too late. Kalikow Decl. ¶¶ 28, 32. Defendants acknowledge that they have not closed any deals since Kulick's departure, but they claim to have remained active in the industry, placing bids on various other projects, albeit unsuccessfully. Def. Facts ¶ 296. The most potent evidence Defendants adduce, however, comes in the form of a February 18, 2020 e-mail from Jonathan Kalikow to Kulick, which reads: "Regarding purchasing anything new, as I stated I am happy to look at stuff that makes sense."[9]  Fairman Decl. Ex. 155.

---

[9] The e-mail continued by stating: "In a tertiary market though like Greensboro, NC the max leverage I would consider would be 60% and absolutely no pref. So if you have equity for that then great. If you don't, then you are

This evidence in the record creates a genuine dispute of material fact as to whether an investment in D&G fell within SLP's line of business at the time that it was diverted, and whether SLP had an interest or expectation in D&G.  The Court thus denies both motions for summary judgment as it relates only to this theory of breach of a fiduciary duty.  In doing so, the Court recognizes that "the determination of whether a corporate fiduciary has usurped a corporate opportunity is fact-intensive and turns on, *inter alia*, the ability of the corporation to make use of the opportunity and the company's intent to do so."  *Broz*, 673 A.2d at 151.

### 3) The Remedy

As a remedy for Kulick's breach of his fiduciary duty, Defendants seek to disgorge his salary and company-paid benefits for the period of his disloyalty; to be compensated for the work performed by their analysist, Mack Levine, at Kulick's instruction; and to receive the expected profits from the D&G investment.  Since the Court denied summary judgment on the usurpation claim, however, no compensation can be awarded at this point for loss of the D&G opportunity.

As for disgorgement, Defendants claim that Kulick's period of disloyalty spanned from February 16 to March 31, 2020, during which time Kulick was paid $46,752.90.  Def. Facts ¶ 496.  Kulick does not dispute this timeframe, the calculated figure, or the availability of this sort of damages.  Pl. Br. at 18 ("[T]he only cognizable damages under the law are limited to the return of Kulick's wages for the period [if] he is found to have been engaged in unfair competition or breach of duty."); *see also Tyco Int'l, Ltd., v. Kozlowski*, 756 F. Supp. 2d 553, 562 (S.D.N.Y. 2020) ("A faithless servant forfeits all compensation earned during the period of

---

wasting a lot of time."  Fairman Decl. Ex. 155.  Kulick forwarded the e-mail the following day to Alexis Kulick, commenting: "Ridiculous.  There is no equity that wants to do 60% leverage, which he knows.  This is him either being in a mood *or just telling me he doesn't want to do deals*."  Fairman Decl. Ex. 155 (emphasis added).

his disloyalty even if his services benefited the principal in some part.").[10]  Kulick also does not

dispute Defendants' request for compensation based on the time Levine spent performing tasks

at Kulick's instruction and for the benefit of Beacon.  Defendants estimate that Levine performed

15 hours' worth of tasks, totaling $873.  Fairman Decl., Ex. 303 ¶¶ 6, 10, 13, 17, 20.  Given that

the damages here are undisputed, the Court will award Defendants the requested amount.

### C. Cause of Action Three – Breach of Contract

To establish a claim for breach of contract under Delaware law, one must prove: (1) the

existence of a valid and enforceable contract; (2) that the contract was breached; and (3) that

damages resulted.[11]  *See Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I,*

*L.P.*, C.A. No. 2017-0393-AGB, 2020 WL 3042236, at *8 (Del. Ch. June 8, 2020).  Because

there is no dispute that the SLP Agreement is a valid and enforceable contract, this claim turns

on the latter two elements.

### 1) Breach

Defendants contend that Kulick violated Section 9.4 of the SLP Agreement, which

provides that "each Member agrees that he or she will not at any time, whether during his or her

employment with the Company or thereafter, disclose to anyone (other than in furtherance of the

business of the Company) any Confidential Information, or utilize such Confidential Information

for his or her own benefit, or for the benefit of third parties."  SLP Agreement § 9.4(a).  The term

"Confidential Information" is defined broadly to include Gamma's models, formulas, access to

computer files, know-how, designs, marketing strategies and financial and business projects.

---

[10] Defendants claim that since Kulick was an employee of Gamma, which is headquartered in New York and where Kulick worked, the requested relief is governed by New York law.  Kulick does not dispute this point.

[11] This claim is governed by Delaware law because it arises out of or in connection with the SLP Agreement.

SLP Agreement § 9.4(a).  The term also includes "[a]ny information that is not readily available to the public . . . even if it is not specifically marked [Confidential]."  SLP Agreement § 9.4(a).

Defendants have adduced overwhelming evidence in support of their claim that Kulick violated Section 9.4 of the SLP Agreement.  Kulick sent Imery and other soon-to-be Beacon colleagues a variety of different documents that constituted Confidential Information for the purpose of advancing his own interests and that of his new company.  These documents included, among other things, investor presentations created by Gamma and marked "STRICTLY CONFIDENTIAL"; underwriting models that Gamma had developed; Gamma's internal Pro-Ration File used in connection with the sale of an SLP Platform Investment; and Gamma's Multifamily Curriculum Vitae for Q1 2020, which was also marked STRICTLY CONFIDENTIAL on every page.  Def. Facts ¶¶ 352, 359-62, 367, 370-76, 380, 383-85, 389-92, 399-403.

Kulick contends that he never disclosed any Confidential Information to Imery or his associates, as any information he provided was already in Imery's possession or was routinely distributed by Gamma itself to members of the public.  Specifically, Kulick claims that "Imery had been in possession since April 2016 of *the exact type of information* Gamma now claims is confidential, as Kulick and Michelle Johnson [Gamma's Managing Director of Capital Raising and Investor Relations] properly sent it to him in connection with various prospective investments."[12]  Pl. Br. at 48.  The critical word here is "*type*."  That Imery possessed old versions of certain models, given to him for the purpose of advancing Gamma's interests, does

---

[12] Imery was a point of contact or asset manager for certain entities that made investments organized by Gamma in Wavery, Bartram, Aventine, and Springfield, which explains why he previously may have been sent certain Gamma documents.  Fairman Ex. 18, (Imery Dep. Tr.) at 32:20-23, 39:4-9, 46:14-47:6, 47:20-24, 48:4-24.

not entitle him to updated versions, sent only to advance the interests of a new and separate company.[13]

Moreover, Kulick presents no evidence to support his contention that the information he sent to Imery in the final month of his employment was available to the public generally, rather than being available, as Defendants assert, to only actual and prospective investors in Platform Investments.  Kalikow Decl. ¶ 18.  This is unsurprising, as Kulick would have had no need to sneak Imery and his associates the relevant information via his Gamma e-mail account if that information was generally available to the public.  By providing Imery this information, which he would not otherwise have been able to access, Kulick clearly breached Section 9.4 of the SLP Agreement.

### 2) Damages

Defendants' initially sought relief in the form of both money damages and an injunction requiring "the return of its Confidential Information and the destruction of all information, documents and work-product prepared by Beacon based upon or using its Confidential Information."  ECF No. 42 at ¶¶ 130, 132.  But things seem to have evolved.  When Kulick argued in his summary judgment briefing that Defendants failed to prove any damages, Defendants responded by appearing to abandon any claim for money damages, and modifying the relief sought to injunctive relief alone.  Specifically, Defendants stated in their reply brief that they are seeking "enforcement of § 8.1(d)" of the SLP agreement (Def. Reply at 16), which

---

[13] Neither Imery nor any other Beacon principal was able to produce from their files the relevant Gamma Pro-Ration File, or various other Gamma materials sent by Kulick, and there is no admissible evidence to support Kulick's contention that they had received those documents before Kulick forwarded them in March 2020.  Def. Counter ¶¶ 136-49.

required Kulick to "immediately return" to SLP the relevant materials upon his withdrawal.  SLP

Agreement § 8.1(d).

To receive a permanent injunction, one must demonstrate "(1) actual success on the

merits; (2) irreparable harm; and (3) that the harm resulting from a failure to issue an injunction

outweighs the harm to the opposing party if the court issues the injunction."  *Metro Storage*, 275

A.3d at 871 (alterations adopted).  Defendants have met all the requirements.

As discussed above, Defendants have proven that Kulick breached the confidentiality

provision in the SLP Agreement.  In so doing, Defendants also established irreparable harm.[14]

*See id.* (finding that "[t]he plaintiffs . . . established irreparable harm by proving a breach of the

Confidentiality Provision"); *see also Cabela's LLC v. Wellman*, C.A. No. 2018-0607-TMR, 2018

WL 5309954, at *14 (Del. Ch. Oct. 26, 2018) (finding that a breach of a confidentiality provision

subjected the plaintiff to "unfair competition and irreparable harm").  The third element requires

a balancing of the equities.  Kulick's sharing of the confidential information for the purpose of

advancing his own interests, and those of his new company, were not accidental or incidental,

but was done knowingly and with the intent to piggyback off the labors and resources of his now

former (then current) employer.  There can be no inequity in requiring Kulick to give back the

materials he wrongfully took.

The final order entered in this action will include a permanent, mandatory injunction

requiring Kulick to return all of the confidential and proprietary information belonging to

Gamma.

---

[14] This case is distinguishable from *Seibold v. Camulos Partners LP*, C.A. No. 5176-CS, 2012 WL 4076182 (Del. Ch. Sept. 17, 2012), where the court declined to grant a permanent injunction, because the former employee in that case had already "made a good faith effort to identify and return [the confidential information], [and] made sure that [he and his new business] could not use it for further business purposes."  *Id.* at *27.  Still, the *Seibold* court gave the company "the right to identify with specificity any information that should be returned to it, which it believes has not yet been returned."  *Id.*

### D. *Cause of Action Four – Unfair Competition*

Under Delaware law, the "elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Ethypharm S.A. v. Abbott Labs.*, 598 F. Supp. 2d 611, 618 (D. Del. 2009) (quoting *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001)). "The essential element separating unfair competition from legitimate market participation . . . is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue." *EDIX Media Grp. v. Mahani,* C.A. No. 2186-N, 2006 WL 3742595, at *11 (Del. Ch. Dec. 12, 2006).

Defendants claim that "[f]or the same reasons that Kulick breached his fiduciary duties by usurping corporate opportunities and improperly utilizing Defendants' resources to do so, he also engaged in unfair competition." Def. Br. at 33-34. For the same reason that this Court cannot grant summary judgment to either party on the claim that Kulick usurped corporate opportunities, it also cannot grant summary judgment on the claim that he engaged in unfair competition. The jury must decide whether Kulick prevented Defendants "from legitimately earning revenue" from D&G.

## II.    THID-PARTY CLAIMS

Defendants also brought various third-party claims against Imery and Beacon. As discussed above, the Court will apply New York law to these claims.

### A. *Cause of Action One – Aiding and Abetting*

"Under New York law, there are three elements to a claim for aiding and abetting a breach of fiduciary duty": (1) "a breach by a fiduciary of obligations to another"; (2) "that the defendant knowingly induced or participated in the breach"; (3) "that plaintiff suffered damage

as a result of the breach." *In re Sharp Int'l Corp.*, 403 F.2d 43, 49 (2d Cir. 2005) (internal

quotation marks omitted).  "A person knowingly participates in a breach of fiduciary duty only

when he or she provides 'substantial assistance' to the primary violator." *Lerner v. Fleet Bank,

N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (cleaned up) (citation omitted).  "Substantial assistance

may only be found where the alleged aider and abettor affirmatively assists, helps conceal or

fails to act when required to do so, thereby enabling the breach to occur.  The mere inaction of an

alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary

duty directly to the plaintiff."  *Sharp*, 403 F.3d at 50.

      Defendants clearly have demonstrated that Imery encouraged and substantially assisted

Kulick's breach of fiduciary duty.  Kulick's misconduct was no secret to Imery.  On March 17,

2020, for instance, Kulick wrote Imery and several other soon-to-be Beacon employees that "it

looks like we can take" the D&G deal, and he directed the others to "put these deals into the

Gamma models and create a presentation" for prospective investors.  Fairman Decl., Ex. 204.

This e-mail, among others, demonstrates that Imery knew not only that Kulick had

misappropriated Gamma materials, but that these materials were being used to advance the

interests of a new company that Imery and Kulick had formed.

      There is further unrebutted evidence in the record that Imery was a knowing participant

who affirmatively assisted Kulick, thereby enabling the breach to occur.  For example, Imery

interacted with the misappropriated material, personally repurposing a letter of intent created by

a Gamma employee, and forwarded to him by Kulick, to be used in pursuing a new investment

opportunity.  Def. Facts ¶¶ 323-30.  This alone is sufficient to establish aiding and abetting

liability.  *See Pure Power*, 813 F. Supp. 2d at 530 (finding that third party aided and abetted

because she "knew that [the principal] had unlawfully taken these materials from [the company],

and she relied upon them in drafting [a competitor's] business plan").  In short, Imery was not a

frozen bystander to the wrongdoing; he was *partners* with the wrongdoer, seeking to profit from

his misdeeds.  This is more than inaction; it is aiding and abetting.  And because Imery is a

manager of Beacon (Def. Facts ¶ 10), his knowledge and conduct are imputed to Beacon

regardless of whether he had "fully brought [Beacon] into existence at the time that the duty was

breached for its benefit."  *Seibold v. Camulos Partners LP*, C.A. No. 5176-CS, 2012 WL

4076182, at *11 (Del. Ch. Sept. 17, 2012).

The result is that Beacon and Imery are "jointly and severally liable for all compensatory

damages caused by the breach."  *Pure Power*, 813 F. Supp. 2d at 530 (citing *Wechsler v.*

*Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941) ("Anyone who knowingly participates

with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to

the *cestuis que trust*.")).  This includes the $873 in damages for time spent by Levine, and the

$46,752.90 to be disgorged from Kulick's salary.  *See id.* at 523 ("Plaintiffs seek as

compensatory damages for [the defendants'] breach of their duty of loyalty to [the company] a

disgorgement of all revenues earned by [defendant company] . . . .").

## B.  Cause of Action Two – Tortious Interference

The elements of tortious interference with a contract are "(1) the existence of a contract

between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's

intentional inducement of the third party to breach or otherwise render performance impossible;

and (4) damages to plaintiff."  *Bernberg v. Health Mgmt. Sys., Inc.*, 303 A.D.2d 348, 349 (2d

Dep't 2003) (internal quotation marks omitted).  Moreover, "a plaintiff must allege that the

contract would not have been breached 'but for' the defendant's conduct."  *Burrowes v. Combs*,

25 A.D.3d 370, 808 N.Y.S. 50, 53 (1st Dep't 2006).  No party disputes that the SLP Agreement

is a contract between Kulick, Gamma Funding and JVM, or that Beacon and Imery had

knowledge of that contract.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465, 912 N.Y.S.2d

508, 938 N.E.2d 941 (2010) ("[T]he acts of agents, and the knowledge they acquire while acting

within the scope of their authority are presumptively imputed to their principals.").  The outcome

of this claim thus turns on the latter two elements: but-for causation and damages.

There are genuine disputes of material fact with respect to both of these elements.  As for

causation, Defendants contend that Beacon intentionally induced Kulick to breach the SLP

Agreement by making him a managing member in a new competing business and by agreeing to

use Gamma's resources for the benefit of that business.  The Third-Party Defendants, by

contrast, claim that they were not the "but for" cause of Kulick's breaches, and that Defendants

have proffered no admissible evidence to prove otherwise.  This dispute cannot be resolved at

this stage.  The same is true with respect to the dispute over damages, as Defendants claim only

loss of the D&G opportunity, which they have not established.

### C.  Cause of Action Three – Unfair Competition

"Under New York law, 'the essence of an unfair competition claim . . . is that the

defendant has misappropriated the labors and expenditures of another' and has done so in bad

faith."  *Cost Cutting Consultant, Inc. v. Parcel Mgmt. Auditing & Consulting Inc.*, No. 19-cv-

3756, 2022 WL 992087, at *7 (E.D.N.Y. Mar. 31, 2022) (quoting *Saratoga Vichy Spring Co.,*

*Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)).  Moreover, "in order to establish unfair

competition it must first be shown that defendants have actually been competing to some

substantial degree." *Bercy Indus., Inc. v. Mech. Mirror Works, Inc.*, 274 F. Supp. 157, 163 (S.D.N.Y. 1967).

Defendants allege that Imery and Beacon engaged in unfair competition by "misappropriat[ing] the fruits of [Gamma's] and SLP's labor and expenditure by obtaining access to [Gamma's] and SLP's confidential information through fraud, deception, and the abuse of a fiduciary and confidential relationship." ECF No. 42, Third Party Complaint ¶ 169. This claim stalls for the same reasons that applied to the unfair competition claim against Kulick alone. As discussed above, there is a genuine dispute of material fact as to whether Kulick believed that SLP and Gamma were still interested in investing in new properties, and thus whether he misappropriated their resources "with the intent to deprive [them] of business." *Turner v. Temptu Inc.*, No. 11-cv-4144, 2013 WL 4083234, at *12 (S.D.N.Y. Aug. 13, 2013). The Court thus denies both motions for summary judgment on this claim.

### D.  *Cause of Action Four – Unjust Enrichment*

"To prevail on a claim of unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted). Defendants allege that Beacon has been, and will continue to be, unjustly enriched by Kulick's misconduct at the expense of SLP and Gamma.[15] ECF No. 42, Third Party Complaint ¶¶ 173-75.

"[W]here the validity of a contract that governs the subject matter at issue is not in dispute, and the claimant alleges breach of the contract, the claimant cannot plead unjust enrichment in the alternative under New York law." *Stanley v. Direct Energy Servs., LLC*, 466

---

[15] Defendants explain that this claim was intended to be made against Beacon only, but that they included Kulick (who is not a third-party defendant) as a mistake. Def. Opp. at 58 n.49.

F. Supp. 3d 415, 430-31 (S.D.N.Y. 2020) (citing *Beth Isr. Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006)).  Here, Defendants' unjust enrichment claim is premised on the same operative facts as those that gave rise to Defendants' counterclaim against Kulick for breach of the SLP Agreement and their third-party claim for tortious interference with the SLP Agreement.  Defendants claim that this is not so, and that "the claims are wholly distinct."  Def. Opp. at 58.  But Defendants do not list a single distinction. This is unsurprising, given that each claim arises from Kulick's misappropriation of Gamma and SLP resources.

The Court thus concludes that the unjust enrichment claim must be dismissed as duplicative.  *See Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (dismissing unjust enrichment claim because the plaintiff's "failure to allege the contracts at issue are invalid or unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter"); *Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12-cv-5392, 2015 WL 5719759, at *12 (E.D.N.Y. Sept. 29, 2015) (holding that plaintiff's unjust enrichment allegation was "duplicative and arises out of the same operative facts [as] plaintiff's claim[] of tortious interference with contract").

### E.  Cause of Action Five – Permanent Injunction

Defendants claim that Beacon and Imery should be permanently enjoined from using any of the information improperly obtained from Gamma.  However, "injunctions are remedies and may only be issued on an independent claim for relief."  *Goureau v. Lemonis*, No. 20-cv-4691, 2021 WL 4847073, at *5 (S.D.N.Y.).  "For this reason, the Court must dismiss the request[] for . . . injunctive relief as [an] improper cause[] of action."  *Id.*  But this is largely a formality, since,

as discussed above, *see supra* Section I.C.2., the Court has granted a permanent injunction against Kulick as relief in connection with Defendants' breach of contract claim.

**III.   KULICK'S CLAIMS**

Each of Kulick's claims against Defendants arise either from the SLP Agreement or from the Manager LLC Agreements, all of which are governed by Delaware law.  As a result, this Court applies Delaware law to each of these claims.

### A.   Cause of Action One – Breach of the SLP Agreement

To establish a claim for a breach of contract under Delaware law, a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) that the defendants breached the contract; and (3) that the plaintiffs was damaged as a result of those breaches.  *See Yenni Income*, C.A. No. 2017-0393-AGB, 2020 WL 3042236, at *8.  Kulick claims that Defendants breached the SLP Agreement "[b]y purporting to belatedly change Kulick's negotiated Involuntary Withdrawal to a termination for 'Cause,' and thereby purporting to terminate Kulick's Class C Membership Interests."  ECF No. 20, Amended Complaint ¶ 106.

The framing of this purported breach is unusual and confounding.  Kulick effectively alleges that Defendants breached the SLP Agreement by attempting to assign cause retroactively and thereby redeeming his interest for a penny.  But Kulick himself alleges that Defendants never actually acquired that interest.  Kulick seemingly requests 12.5 percent of the promote income from all investment properties that have been sold as damages for this purported breach, although the promote income from certain of those properties remains unknown.  This is a

roundabout way of seeking to recover damages for a membership interest that could have been purchased for fair market value absent cause.

But this is all academic.  As discussed above, *see supra* Section I.A., Defendants did not breach the SLP Agreement when they retroactively assigned Cause to Kulick's termination and redeemed his Class C Membership interests.

### B.  Cause of Action Two – Fiduciary Duty Claim Related to SLP

Kulick next alleged that Gamma Funding and JVM breached fiduciary duties owed to him by engaging in a "scheme" commenced prior to the termination of his employment to (i) force him out of SLP; (ii) hinder his ability to manage SLP's property portfolio; (iii) sabotage his relationships with property managers and investors; and (iv) capitalize on his experience and reputation to obtain financing, "while endeavoring to deprive him of his economic interests." ECF No. 20, Amended Complaint ¶ 114.  But that allegation has been distilled on summary judgment to something more familiar: A claim of "conscious intent by SLP's members to deprive Kulick of his contractual opportunity to have his class C membership bought out at fair market value pursuant to the SLP agreement."  Pl. Br. at 33.

To establish a breach of fiduciary duty, a plaintiff must demonstrate: "(i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty."  *Metro Storage*, 275 A.3d at 840-41.  Kulick falls far short of establishing the latter element.

Kulick requested that Defendants buy out his interests and Defendants, becoming increasingly frustrated with what they viewed as his inadequate performance, denied that request, but thereafter terminated Kulick without Cause.  As Kulick's final day of employment approached, Kalikow sent Kulick an e-mail confirming that "absent a termination 'for cause', and unless the other members elect to buy out [his] Class C Membership Interests, [he] will

retain [his] 12.5% Class C Membership Interests."  Zeisler Decl. Ex. 37.  It thereafter came to

light that, after being notified of his termination without cause, Kulick misappropriated Gamma

and SLP resources to chase corporate opportunities on behalf of a new company.  Defendants

could not have known when they first terminated Kulick that he would act disloyally.  And they

did not have to labor hard to uncover the wrongdoing; they surreptitiously stumbled upon the

evidence of misconduct.  Had Kulick not misappropriated Gamma's resources for his own

benefit—or at least not been reckless enough to use his Gamma e-mail address in doing so—he

would have retained his Class C Membership interests or had them purchased for fair market

value.  The only scheming that led to Kulick's termination for Cause was his own.

### C. Cause of Action Five – Breach of the GRE Charlotte GP LLC Agreement

Kulick contends that Illuzzi and Nguyen breached the operating agreement for GRE

Charlotte GP LLC by failing to distribute the "net profits" from the sale of Stone Ridge and

Whitehall to its members (including Kulick) "in proportion to their Economic Interests."[16]  ECF

No. 20, Amended Complaint ¶¶ 134-39.  It is undisputed that these profits were distributed

directly to SLP.  Kulick claims that this purported breach was done by Illuzzi and Nguyen "in

order to avoid paying Kulick his share."  ECF No. 20, Amended Complaint ¶ 138.

The root of this claim (setting aside the improper motives that Kulick ascribes to Illuzzi

and Nguyen) is that any assignment of interest to SLP required the written consent of a majority

of the members of GRE Charlotte GP LLC, which it did not have. On top of that, however,

---

[16] It is undisputed that Kulick retains both his Managing Member status and his Economic Interests in the LLC entities associated with The Partnership Properties, regardless of the "termination" of his interests in SLP.  Pl. Facts ¶ 22.

Kulick claims that there was, in fact, no assignment—oral or written—and that any assignment would be unenforceable for lack of consideration.

To understand this claim, it is first necessary to understand (as best as possible) all the entities involved in the transaction.  Both the Stone Ridge and Whitehall properties are wholly owned by AP-GRE Charlotte MF, LP ("Charlotte Holding I").  Def. Facts ¶ 85.  The general partner of Charlotte Holding I is AP-GRE Charlotte MF GP, LLC ("Charlotte Holding II").  Def. Facts ¶ 86.  Section 5.1(b) of the Limited Partnership Agreement for Charlotte Holding I provides for the distribution of funds, including the payment of "Promote Distributions," to Charlotte Holding II.  Pl. Facts ¶ 13.  Thereafter, Section 3.1 of the Limited Liability Company Agreement of Charlotte Holding II directs that "Cash Available for Distribution . . . shall be allocated and distributed to the Members in accordance with their then applicable Percentage Interests."  Pl. Facts ¶ 14.  The managing member (and 60 percent interest holder) of Charlotte Holding II is GRE Charlotte GP LLC ("Charlotte Holding III").  Def. Facts ¶ 87.  Kulick, Nguyen and Illuzzi each own a 33.33 percent management and a 33.33 percent economic interest in Charlotte Holding III.  Pl. Facts ¶ 106.  As such, distribution from the net profits of sales of Stone Ridge and Whitehall were, by contract, owed one-third each to Kulick, Nguyen, and Illuzzi.

But Charlotte III never received for distribution to its members any of the income generated from the Stone Ridge and Whitehall sales.  Instead, Defendants contend that Charlotte III assigned to SLP the roughly $1.5 million to which it was entitled.  Def. Facts ¶ 110.  Kulick claims that this assignment, which was done without any written consent, constituted a breach of the Charlotte Holding III operating agreement, which requires "the prior written consent of a

Majority in Interest of the Class A Members and a Majority in Interest of the Class B Members"
before any "Transfer of Interest."  Zeisler Decl., Ex. 11 at § 5.9(i).

Kulick is mistaken.  The referenced provision governs only a "Transfer" of an "Interest"
*in* Charlotte Holding III—*i.e.*, a transfer of "Economic Interest, Management Interest and/or
Membership Interest" by Nguyen, Illuzzi, or Kulick.  Zeisler Decl., Ex. 11, Art. II.  The
assignment at issue, by contrast, is one made *by* Charlotte Holding III, and is governed by the
Charlotte Holding II agreement, which provides that Charlotte Holding III has the right to,
*without* prior written consent requirement, "assign all or a portion of its economic rights to
receive distributions of Cash Available for Distribution hereunder to any Affiliate."  Fairman
Decl. § 9.1.3.  SLP is, indisputably, an Affiliate of Charlotte Holding III.  Def. Facts ¶ 96.

Kulick next claims that even if there was no written consent requirement, there
nevertheless was a breach of contract since he disputes that there was ever an assignment of any
sort, oral or written.  But Nguyen testified to the existence of a verbal agreement.  Fairman Decl.,
Ex. 17 (Nguyen Dep. Tr.) at 264:17-19 ("We had a verbal agreement.  We had an agreement in
principal, in concept.").  And while Kulick disputes the existence of such an agreement in his
briefing, he identifies no admissible evidence to that effect, although it is unclear what evidence
one can offer that an agreement does not exist.  Pl. Reply Br. at 18.  A genuine dispute does not
exist, however, as a result of Kulick's vague and self-serving testimony that his "position in this
lawsuit . . . is simply that the governing documents were not followed."  Fairman Decl., Ex. 19
(Kulick Dep. Tr.) at 62:13-16.  Moreover, Kulick's attempt to dispute Nguyen's testimony on
this issue is at odds with the fact that Kulick is the one who *approved* the transfer while he was

still employed as the Administrative Member for SLP—that is, before his misconduct came to light.[17]  Def. Facts ¶ 110.

Finally, Kulick claims that any assignment is "unenforceable for lack of consideration." *Street Search Partners, L.P. v. Ricon Int'l., L.L.C.*, 2006 WL 1313859, at \*4 (Del. Sup. Ct. May 12, 2006).  But the due diligence work done by SLP for Stone Ridge and Whitehall and the various expenses advanced by SLP before and after those properties were acquired, Def. Facts ¶ 99, are sufficient consideration for an assignment.  *See In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 412 n.15 (S.D.N.Y. 2010) (finding that the "promise to conduct due diligence formed part of the consideration for the Plaintiffs' purchase of interests in the Beacon Fund").

### D.  Cause of Action Six – Fiduciary Duty Claim Related to LLC Agreements

Kulick next alleges that the Individual Defendants breached their fiduciary duties by funneling funds from the Manager LLCs to SLP for the sole purpose of preventing Kulick from being paid his fair share as a member of the Manager LLCs.  ECF No. 20, Amended Complaint ¶¶ 141-50.  A claim for breach of fiduciary duty under Delaware law "has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty."  *Metro Storage*, 275 A.3d at 840-41.

The first question is whether the Individual Defendants owed Kulick a fiduciary duty in their capacity as members of the Manager LLCs.  At first glance it might appear that no such duty was owed, since none of the Individual Defendants own a majority interest in a Manager LLC,[18] and under Delaware law "minority members of an LLC do not owe fiduciary duties to

---

[17] On March 14, 2020, Kulick approved the transfer of promote income of roughly $1.5 million from Charlotte Holding II to SLP, in an e-mail entitled "Charlotte Sale Distribution."  Fairman Decl., Ex. 55.  Specifically, Evan Gottlieb set forth in an e-mail the details of the planned transfer, to which Kulick responded: "This is fine . . . ."  Fairman Decl., Ex. 55.

[18] Each of the Manager LLCs is either equally owned by Kulick and two of the Individual Defendants, or is equally owned by Kulick and all four Individual Defendants.  Def. Facts ¶¶ 88, 144, 169, 183, 196, 208, 221, 235, 251, 264.

other members." *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 608 (S.D.N.Y. 2011) (collecting Delaware cases).  But the Individual Defendants were no strangers.  The Kalikows controlled Gamma Funding, while Illuzzi and Nguyen controlled JVM.  And with the redemption of Kulick's Cass C Membership Interests, the Individual Defendants were the only remaining owners of SLP.  The question of duty thus boils down to whether the Individual Defendants formed a pact or some other agreement to vote in concert and thereby exercise control over the Manager LLCs.  *See Dubroff v. Wren Holdings, LLC*, C.A. No. 3940-VCN, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("Delaware case law has recognized that a number of shareholders, each of whom individually cannot exert control over the corporation . . . , can collectively form a control group where those shareholders are connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.  In that case, the control group is accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders.").  That question must be left for the jury.

The duty question is mooted, however, if there is no breach.  The starting point in the breach analysis must be the Manager LLC Agreements, since Delaware law provides that where the parties "cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default."  *Related Westpac LLC v. JER Snowmass LLC*, C.A. No. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010).  Here, the Manager LLC Agreements each contain provisions that either *require* the Manager LLCs to pay out promote income to SLP,

Case 1:20-cv-03582-MKV   Document 104   Filed 09/23/22   Page 46 of 48

or that *permit* the Manager LLCs to assign their interests in the promote income to SLP. Def. Counter ¶¶ 262-63. Any breach of fiduciary duty must be considered in light of these provisions.

It makes no sense, of course, to suggest that the Individual Defendants breached their fiduciary duties by paying promote income directly to SLP when the Manager LLC agreements provided for no other option—*i.e.*, with respect to certain of those agreements that made payment to SLP mandatory. Things are less clear, however, as it pertains to the Manager LLCs for which assignment to SLP was merely permitted. Indeed, the contrast between the mandatory and permissive payments to SLP seems to suggest that the parties to the Manager LLC Agreements contemplated that there might be instances in which promote income would *not* be paid to SLP, but would instead be distributed to the members of the Manager LLCs, including Kulick, in accordance with their percent ownership. Whether the Individual Defendants have eschewed that distribution option for the sole purpose of preventing Kulick from getting his contractual share is a question of fact that must be resolved by the jury.

Thus, Kulick's motion for summary judgment on this breach of fiduciary duty claim is denied. Defendants' motion for summary judgment is granted only insofar as it concerns claims of breach premised on funds transferred pursuant to provisions that make such transfers mandatory.

### E. Cause of Action Seven – Aiding and Abetting Breaches of Fiduciary Duty

To prevail on a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a party must prove four elements (1) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach, and (iv) damages proximately caused by the breach. *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015). Kulick alleges that "Defendants, including but not limited to non-fiduciaries [Gamma] and SLP,

knowingly participated in these breaches of fiduciary duty [by the Individual Defendants] by receiving funds from The Partnership Properties and by co-mingling these improperly received funds with those of other [Gamma]-controlled entities."  ECF. No. 20, Amended Complaint ¶ 154.  This claim applies nominally to both the second and sixth causes of action alleging breaches of fiduciary duty.  Since only the sixth cause of action survives summary judgment, this aiding and abetting claim survives only to the extent that it is premised on that cause of action.

## CONCLUSION

As set forth herein, Defendants' Motion for Summary Judgment is granted insofar as it sought an order dismissing each cause of action remaining in Kulick's Amended Complaint, with the exception of Causes of Action Six and Seven, which are dismissed only in part; insofar as it sought an order granting summary judgment on its counterclaims for a declaratory judgment, breach of fiduciary duty (premised only on misappropriation of resources and solicitation of clients theories), and breach of contract; and insofar as it sought an order granting summary judgment on its third-party claim for aiding and abetting.  Defendants' Motion is denied in all other respects.  The Motion for Summary Judgment made by Kulick and the Third-Party Defendants is denied in its entirety.

Kulick must forfeit the full measure of compensation he received from Defendants during the period of wrongdoing, namely $46,752.90, and must also pay $873 for the misappropriation of Gamma's personnel, plus any applicable interest.  The specific amounts of any appropriate pre-judgment interest shall be subsequently determined and authorized by the Court upon a properly supported application by Defendants.  The Third-Party Defendants are jointly and severally liable for all damages.  Finally, Defendants are entitled to a mandatory injunction requiring Kulick to return all of the confidential information belonging to Gamma.

The Clerk of Court respectfully is requested to close the Motions at ECF Nos. 72 and 77.

**SO ORDERED**

**Date:   September 23, 2022**
**New York, New York**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**